IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

SEP 17 2002

**HENRY ELLIOT,**

     **Plaintiff,**

vs.

Civ. No. 01-1410 LH/RLP

**JO ANNE B. BARNHART,
Commissioner of Social Security,**

     **Defendant.**

## UNITED STATES MAGISTRATE JUDGE'S
## ANALYSIS AND RECOMMENDED DISPOSITION[1]

1.    Henry Elliot ("Plaintiff" herein), appeals the decision of the Commissioner of Social Security to deny his applications for disability benefits under Titles II and XVI of the Social Security Act. He contends that the Administrative Law Judge ("ALJ" herein) made errors at steps three, four and five of the sequential evaluation process. For the reasons stated here, I recommend that Mr. Elliot's motion be granted in part, and that this matter be remanded for additional proceedings at steps four and five of the sequential evaluation process.

I.

2.    This Court reviews the Commissioner's decision to determine whether the records contain substantial evidence to support the findings, and to determine whether the correct legal standards were applied. **Castellano v. Secretary of Health & Human Services,** 26 F.3d 1027, 1028 (10th Cir.1994). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as

---

[1] Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. §636(b)(1), file written objections to such proposed findings and recommendations. A party must file any objections within the ten (10) day period if that party seeks appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.



adequate to support a conclusion.' " **Soliz v. Chater**, 82 F.3d 373, 375 (10th Cir.1996) (quoting **Richardson v. Perales**, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). In reviewing the Commissioner's decision, the court cannot weigh the evidence or substitute our discretion for that of the Commissioner, but I have the duty to carefully consider the entire record and make my determination on the record as a whole. **Dollar v. Bowen**, 821 F.2d 530, 532 (10th Cir.1987).

3. The Commissioner has established a five-step sequential evaluation process to determine if a claimant is disabled. **Reyes v. Bowen**, 845 F.2d 242, 243 (10th Cir.1988). If a claimant is determined to be disabled or not disabled at any step, the evaluation process ends there. **Sorenson v. Bowen**, 888 F.2d 706, 710 (10th Cir.1989). The burden of proof is on the claimant through step four; then it shifts to the Commissioner. Id.

II.

4. Mr. Elliot was born on April 11, 1972. He graduated from high school, where he attended special education classes due to learning disabilities.[2] (Tr. 165). He filed applications for benefits in May 1997, with a protective filing date of April 23, 1997, alleging disability since September 1995 due to a combination of mental impairments (seizures, bi-polar disorder, panic attacks, learning disabilities, sleep disorder) which prevent him from waking up, cause him to blank out for various amounts of time, prevent him from being in public, produce severe depression and aggressive outbursts, and affect his memory and ability to understand instructions. (Tr. 143).

5. Mr. Elliot sought treatment for anxiety and sleep difficulty in January 1996 at Border Area Mental Health Services, Inc. ("BAMHS" herein) (Tr. 331-333). He was diagnosed with an anxiety

---

[2]Testing administered in his final year of high school indicated that written language skills were his main area of weakness. In addition, he demonstrated significant difficulties in math, e.g., inability to correctly make change. (Tr. 114-123).

2

disorder and polysubstance abuse[3], and given a prescription for Depakote for anger management. (Tr. 331). He returned to BAMHS in October 1996, complaining of anxiety, mood swings, irritability and anger, but declined individual counseling for anxiety. (Tr. 329).

6. He was seen at the Ben Archer Clinic on five occasions between November 1996 and January 1997 for numerous complaints including depression, lack of energy, anxiety and violent anger outbursts. He was placed on Paxil and Xanax. (Tr. 269, 271-275).

7. Mr. Elliot was admitted to the Mental Health Unit of Gila Regional Medical Center in April 1997 for psychiatric treatment. (Tr. 232-241). Physical examinations conducted during this admission, including EEG studies, were normal. Based on history and psychiatric examination, the treating psychiatrist, Alan Berkowitz M.D., diagnosed Bipolar I Disorder, current episode depressed[4], Polysubstance dependence[5], Social phobia[6] - generalized, reading, mathematics and written expression disorders (Axis I) and possible partial complex seizures[7] (Axis III). (Tr. 232). He

---

[3]Plaintiff admitted to using alcohol and cocaine. (Tr. 332)

[4]Dr. Berkowitz noted "he had his first depression in the third grade. It was an atypical depression with hypersomnia and hyperphagia. He had another serious depression in his last year of high school, also with hypersomnia and hyperphagia. When he is not depressed, he had chronic insomnia... Interviews with his friends revealed typical hypomanic episodes of which he is still not aware, but two different sources have described them very clearly. (Tr. 232-233).

[5]Plaintiff stated that he became addicted to speed, amphetamines and cocaine between the ages of 21 and 23, and currently used " 'anything (he could) get his hands on' between once a month and 20 x a month." (Tr. 232).

[6]Dr. Berkowitz noted "His drug use appears to involve a fairly severe social phobia, but the patient has, ever since he was a young child, he was anxious in groups of people and he tends not te be able to be in groups or social situations unless he can use alcohol or drugs. He worries about what people will think about him, that he will make a fool of himself, that he will embarrass himself, etc." (Tr. 232) "He has . . . atypical panic attacks which have not responded to Paxil or Prozac or Zoloft." (Tr. 232-233).

[7]Dr. Berkowitz noted "For two years he had been having auditory hallucinations of jazz music playing almost constantly in his mind. He has twenty second long episodes of shaking and making weird noises at night which the patient is not award of. People have told him that his hand moves uncontrollably.

3

prescribed Serzone for mood, social phobia and panic, and Tegretol for possible seizures. (Tr. 233).

8.   Fred Wey, MSW, of BAMHS, began individual counseling sessions with Mr. Elliot on July 7, 1997. Mr. Wey stated that Mr. Elliot's primary problem was chemical dependence, and that his secondary problems were anxiety and depression. He established a treatment plan to address each of these conditions. (Tr. 243-247).

9.   Ernest Florez, M.D., conducted a consultative psychiatric evaluation on Mr. Elliot on July 10, 1997. (Tr. 248-251, 362). Based on interview and record review, Dr. Florez diagnosed chronic depressive disorder, alcohol abuse, and possible cyclothymia[8] and dissociative episodes (Axis I), personality disorder and possible borderline personality structure (Axis II). He felt current medications were "holding" Mr. Elliot's mood swings and depression and concluded:

> In summary, Mr. Elliot is found to have chronic, depressive disorder, learning disability and possible borderline personality. He also drinks. There are episodic dissociative states. At that time, however, if the patient is in a non-stressful environment, he could interact with coworkers and supervisory personnel. The patient is on medication which seems to be stabilizing his moods.
>
> The patient could benefit from vocational rehabilitation to overcompensate for his learning disabilities and his illiteracy.
>
> The patient does suffer from low self esteem, a lack of confidence and over-dependency in relationships. These issues could be addressed in counseling. The patient has been encouraged to stay on his medications.
>
> The patient is competent to handle his disability benefits, if so granted. Certainly, due to his personality conflicts, he may have problems with authority figures.

---

He has olfactory hallucinations and smells lavender and rose aromas. He had dissociative episodes with poor memory . . . brief episodes of apparent loss of consciousness as described by his friends. (Tr. 232-233)

[8]According to the Diagnostic and Statistical Manual of Mental Disorders, 363-66, American Psychiatric Association, 4th ed. (1997), "the essential feature of Cyclothymic Disorder is a chronic, fluctuating mood disturbance involving numerous periods of hypomanic symptoms ... and numerous periods of depressive symptoms."

4

(Tr. 250-251)

10. On August 4, 1997, Mr. Wey completed an "Integrated Assessment Summary." He noted that Mr. Elliot was continuing to use drugs and alcohol[9] (Tr. 318) and exhibited symptoms of Bipolar Disorder NOS and Anxiety Disorder NOS. (Tr. 323). Mr. Elliot was seen for counseling on thirteen occasions between August and December 1997, during which time little progress was noted. He continued to exhibit symptoms of bipolar disorder, continued to use alcohol, but denied drug use. (See, e.g., Tr. 309, 299, 295). By December 1 he had stopped taking Serzone and Tegretol, and noted an escalation in his aggressive behaviors. (Tr. 295). He was evaluated by Dr. Herrera on December 5, who noted:

> Off the Tegretol now for two months. Client with many concerns: DVR - They declined him. GA - but will be cut off after appts. Tegretol could help him avoid confrontations. Lithium still aggressive but stabilized him. Can be up a week and three days. Tegretol - a neighbor paid – did stop staring into space.

(Tr. 294).

On December 18, 1997, Mr. Wey wrote a letter, co-signed by Dr. Herrera, requesting authorization for additional counseling sessions for Plaintiff, stating:

> Mr. Elliot has a long and well-documented history of major depression and possible seizure disorder. I have witnessed a minor "black-out" episode in one of my counseling sessions with Mr. Elliot. . . . Dr. Herrera . . prescribed Tegretol for his depressive disorder and blackouts but Mr. Elliot does not have adequate resources to pay for this prescription at the present time.

---

[9]"He admits to using (alcohol, opiates and other 'pain killers', cocaine, crack, amphetamines, pot, caffeine, tobacco) on a regular basis during his lifetime, as well as 'dabbling with' hallucinogens and 'other stuff you haven't mentioned.' He admits that methamphetamine (speed) is his drug of choice. He has mixed substances in at least 10 days of the last 30, and has used at leased one substance every day this month." (Tr. 318). "Therapist believes Mr. Elliot's primary diagnosis should be Polysubstance Dependence. During the past 12 month period, he was repeatedly using at least three groups of substances, but no single substance predominated. . . These substances seems to be the driving force of his life, and he continues to deny and shows no clear intention of stopping this chemical dependency." (Tr. 323).

5

(Tr. 293).

As of January 21 1998, Mr. Elliot had obtained a voucher for medications, and restarted Tegretol. (Tr. 205).

11. There are only two additional medical records in the file, a psychiatric evaluation by Rita Pacheco-Gonzalez, M.D., dated June 8, 1998 (Tr. 363-369), and a psychiatric review technique form prepared by Dr. Berkowitz on June 12, 1998. (Tr. 370-378)[10]. Dr. Pacheco-Gonzalez evaluated Mr. Elliot for medication management of Bipolar Disorder. (Tr. 363). He advised Dr. Pacheco-Gonzalez that he could not afford Tegretol, which did help his stuttering, forgetfulness, and "disappearing episodes." (Tr. 364). He reported taking Lithium for the past 4-5 days, with no noted changes and continued difficulty with memory. Id. Dr. Pacheco-Gonzalez noted that Mr. Elliot was negative, sarcastic, condescending, anxious, demanding, defensive, irritable, without insight as to the impact of his behavior on others, not overtly psychotic, his thoughts were illogical at times but coherent and goal directed with no evidence of delusions. She recommended that additional psychiatric, psychological and medical evaluation be conducted, and that Mr. Elliot continue seeing his therapist. (Tr. 365).

12. The Psychiatric Review Technique form prepared by Dr. Berkowitz stated that Mr. Elliot met the Listings criteria for mood disorder, social phobia and bipolar disorder, NOS, and exhibited

---

[10] Apparently Plaintiff saw Dr. Berkowitz in May or June 1998, who prescribed Lithium. (Tr. 364). Dr. Berkowitz's records, other than other from the April 1997 hospitalization, are not in the administrative record.

both depressive[11] and manic[12] symptoms. In terms of functional limitations, he indicated that Mr. Elliot had moderate restriction of activities of daily living, marked difficulties maintaining social functioning, frequent deficiencies of concentration, persistence or pace, and repeated episodes of deterioration or decompensation in work or work-like setting (Tr. 377). In addition, Dr. Berkowitz indicated that there was no evidence of an anxiety related disorder or a substance addition disorder. (Tr. 374, 376). He provided no narrative explanation for his evaluation.

### III.

13. Mr. Elliot's applications for benefits were denied initially and on reconsideration. He sought a hearing before an ALJ, which was held on May 13, 1999. He was represented by counsel and testified on his own behalf, stating that he continued to suffer from mood swings, irritability, confusion, loss of memory, panic attacks and anxiety, depression, a sleep disorder and seizures several times a week (Tr. 41-48), and that medication did not help him. (Tr. 43). He stated that had stopped using street drugs two (Tr. 37) or three (Tr. 35) years earlier (Tr. 35). In addition, he submitted letters from his next-door neighbor and from a former employer who corroborated Mr. Elliot's mood swings, easy distractability, failure to show up at work consistently, aggressive tendencies and inability to be in crowds. (Tr. 216, 218). These observations were confirmed by another neighbor, who testified at the administrative hearing. (Tr. 56-66).

14. The ALJ held that Mr. Elliot was disabled at step three of the sequential evaluation process if the combination of his "severe" impairments of polysubstance abuse and dependence with

---

[11]Anhedonia or pervasive loss of interest in almost all activities; sleep disturbance, decreased energy, feelings of guilt of worthlessness, difficulty concentrating or thinking, thoughts of suicide. (Tr. 373).

[12]Hyperactivity, pressures of speech, flight of ideas, easy distractability, involvement in activities that have a high probability of painful consequences which are not recognized. (Tr. 373).

7

depression, learning disability and possible bipolar disorder, dependent personality traits, and possible dissociative disorder were considered.[13] The ALJ applied the Contract with America Advancement Act of 1996, Public L. No. 104-121, 110 Stat. 847 (enacted March 29, 1996). This provision provides: "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. §423(d)(2)(C). The ALJ found that Mr. Elliot:

> . . . does not have significant difficulties with social functioning or concentration when he refrains from using drugs and alcohol to comport with the requirement of the listings [,] and I am persuaded that they fall short of listing-level severity. The claimant's impairments meet the requirements of the listings if his polysubstance abuse is considered. However, the claimant has failed to establish listings level impairments apart from the abuse of substances.

(Tr. 16).

15. In reaching this conclusion, the ALJ considered and discounted the Psychiatric Review Technique form prepared by Dr. Berkowitz, noting that Dr. Berkowitz indicated that there was no substance abuse, despite overwhelming evidence to the contrary in the record. (Tr. 16)

16. The ALJ found that Plaintiff had the residual functional capacity for simple unskilled non-public work at all exertional levels, citing Dr. Florez' opinion that Plaintiff could work in a non-stressful environment and could interact appropriately with others. (Tr. 17).

17. At step four of the sequential evaluation process the ALJ determined that Plaintiff could return to his prior job as a dishwasher, which he stated was simple, routine non-public work in a non-

---

[13]The ALJ found that Mr. Elliot did not a have a "severe" sleep disorder. (Tr. 15). The ALJ stated that he had considered Listings sections 11.03 (epilepsy, minor seizures), 12.04 (affective disorders), 12.05 (mental retardation), 12.08 (personality disorders) and 12.09 (substance addition disorders).

stressful environment. (Tr. 17).

18. At step five of the sequential evaluation process the ALJ determined that Mr. Elliot's limitations did not significantly effect his ability to perform unskilled work at all exertional levels and applied the Medical-Vocational guidelines to conclude that Mr. Elliot was not disabled. He did not utilize the services of a vocational expert.

## IV.

19. Mr. Elliot filed suit in this court challenging the denial of his claims, seeking a remand for additional proceedings. He raises the following errors:

    A.     At step three of the sequential evaluation process, whether the ALJ

        1.     Failed to provide the analysis required by **Clifton v. Chater**, 79 F.3d 1007 (10th Cir. 1996).
        2.     Improperly found that substance abuse was material to Plaintiff's disability
        3.     Improperly disregarded the opinions and treatment notes of treating health care providers.

    B.     At step four of the sequential evaluation process whether the ALJ failed to address the stress demands of his past work.

    C.     At step five of the sequential evaluation process whether the ALJ improperly applied the Medical-Vocational guidelines conclusively in spite of Plaintiff's non-exertional impairments.

## V.

A. The ALJ did not err at step three of the sequential evaluation process

20. Mr. Elliot cites to **Clifton v. Chater**, 79 F.3d 1007 (10th Cir.1996), to argue that the ALJ's conclusions were not sufficiently explained. In **Clifton**, the Tenth Circuit reversed the district court and remanded the case for additional proceedings when the ALJ made "such a bare conclusion" that it was effectively "beyond meaningful judicial review." **Clifton**, 79 F.3d at 1009. The reversal was based on the fact that "the ALJ did not discuss the evidence or his reasons for determining that

appellant was not disabled at step three, or even identify the relevant Listing or Listings; he merely stated a summary conclusion that appellant's impairments did not meet or equal any Listed Impairment." Id. This is not the case here, where the ALJ identified the relevant listings, discuss the evidence and followed the appropriate procedure for documenting the Psychiatric Review Technique Form ratings. These findings are far from the type of summary conclusion rejected in **Clifton**, and, therefore, are not beyond any meaningful judicial review.

21. Next, Mr. Elliot argues that there was no evidence to support the finding that substance abuse was material to his disability. To the contrary, the record is replete with references to Mr. Elliot's ongoing use of alcohol and illicit drugs, and his treating mental health counselor identified polysubstance abuse as his primary problem.

22. Mr. Elliot contends that the ALJ erred in discounting the opinions of Dr. Berkowitz as expressed in the psychiatric review technique form. In disregarding Dr. Dr. Berkowitz' conclusions, ALJ correctly noted that Dr. Berkowitz did not provide an objective basis for the opinions expressed in the form. (Tr. 16). Accordingly, the form did not constitute substantial evidence. **Frey v. Bowen**, 816 F.2d 505, 508 (10th Cir. 1987). To the extent Dr. Berkowitz' hospital records from a year earlier are offered to provide the objective basis for the opinions expressed in the form, the ALJ correctly noted that the two are inconsistent. Dr. Berkowitz' conclusion that there was no evidence of a substance addiction disorder (Tr. 376) is contradicted by the discharge summary he prepared following Mr. Elliot's hospitalization at Gila Regional Medical Center, where Mr. Elliot's long standing use and abuse was recorded, and polysubstance dependence was listed as one of the Axis 1 diagnoses. (Tr. 232-233). It is the ALJ prerogative to note this inconsistency and to discount Dr. Berkowitz' opinion accordingly. **Cf. Goatcher v. Dep't of Health & Hum. Serv.**, 52 F.3d 288, 290

(10th Cir. 1995) (The opinion of a treating physician will be accorded little weight when it is internally inconsistent.).

      B. The ALJ erred at step four of the sequential evaluation process.

23. At step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to return to his past job as a dishwasher. In so doing he identified and accepted limitations in Mr. Elliot's mental residual functional capacity, relying of the evaluation by Dr. Florez that Mr. Elliot could interact with if in a non-stressful environment. The ALJ also accepted that Mr. Elliot was further limited to non-public work. (Tr. 17). Although he did not expressly so state, I assume that the ALJ determined that these limitations would be present absent use of drugs or alcohol.

24. The requirements for making a determination at step four are stated in **Winfrey v. Chater,** 92 F.3d 1017, 1023 (10th Cir. 1996):

> (Step four of the sequential evaluation process) . . . is comprised of three phases. In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity (RFC), see SSR 86-8 Soc. Sec. Rep. Serv., Rulings 1983-1991, 423, 427 (West 1992), and in the second phase, he must determine the physical and mental demand of the claimant's past relevant work. 20 C.F.R. §404.1520(c). In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitation found in phase one. See SSR 82-62 Soc. Sec. Rep. Serv., Rulings 1975-1982, 809; **Henrie v. United States Department of Health & Human Services,** 13 F.3d 359, 361 (10th Cir. 1993). At each stage of these phases, the ALJ must make specific findings. See **Henrie,** 13 F.3d at 361.

25. In evaluating mental impairments, the law of this Circuit is clear:

When the claimant has a mental impairment,

care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g., speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work.

11

**Winfrey v. Chater**, 92 F.3d 1017, 1023 (10th Cir. 1996) (citation omitted).

26. There is no evidence as to the stress involved in Plaintiff's prior job as a dishwasher. In describing this job in written materials, Plaintiff did not address the "stress" involved, and indeed, the form provided for his use inquired only as exertional. (Tr. 169-171). At the administrative hearing, the ALJ asked no questions about Plaintiff's job as a dishwasher.

27. I find that the ALJ failed to develop the record with factual information regarding stress involved in Plaintiff's past relevant work, and whether, given his mental limitations, he could meet the demands of that work an a regular and continuing basis. Accordingly, there is no substantial evidence to support the ALJ's findings with regard to Plaintiff ability to return to his past work as a dishwasher.

    C. The ALJ erred at step five of the sequential evaluation process.

28. The ALJ accepted that Plaintiff had numerous mental limitations that were severe, e.g., that had more than a minimal impact on his ability to work, even if not of listing level severity. (Tr. 15). At step five of the sequential evaluation process he found that these limitations did not significantly effect his ability to perform unskilled work, and applied the Medical-Vocational guidelines ("grids" herein) to conclude that Plaintiff was not disabled. (Tr. 17). In so doing the ALJ ignored his earlier finding that Plaintiff's mental impairment limited him to non-public work in a non-stressful environment. Id.

29. When a claimant has a mental impairment, the ALJ is prohibited from relying solely on the grids in determining that a claimant is not disabled. **Hargis v. Sullivan**, 945 F.2d 1482, 1490 (10th Cir.1991). The grids may be used as a framework for evaluating disability, and when combined with evidence such as relevant testimony by a vocational expert, may support a finding of nondisability.

Id. The ALJ did not obtain additional evidence, such as relevant testimony from a vocational expert, to support his finding of non-disability at step five.

30.     For the foregoing reasons I recommend that the Motion to Reverse and Remand be granted in part, and that this matter be remanded to the Commissioner of Social Security for additional proceedings in order to properly evaluate Mr. Elliot's mental impairment at steps four and five of the sequential evaluation process. These proceedings shall include inquiry into the mental demands of Mr. Elliot's past work, and the impact on the occupational base of his limitation to simple, non-public, non-stressful work.

                                      **RICHARD L. PUGLISI**
                                      **UNITED STATES MAGISTRATE JUDGE**

For Plaintiff:

    Gary J. Marton, Esq.
    Francesca J. MacDowell, Esq.
    A. Michelle Baca, Esq.

For Defendant:

    Cynthia Linn Weisman, Esq.
    Christopher Carillo, Esq.